# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 19, 2013 Session

## STATE OF TENNESSEE v. WILLIAM EUGENE HALL

**Circuit Court for Humphreys County**
**Nos. 10526 et al.   Jon Kerry Blackwood, Judge**

---

**No. M2012-00336-CCA-R3-DD    Filed October 22, 2013**

---

The Appellant, William Eugene Hall, was convicted of two counts of felony murder, three counts of first degree burglary, three counts of grand larceny, and one count of petit larceny. The Appellant received the death penalty for one of the murder convictions, a life sentence for the other, and an effective eighty-year sentence for the remaining convictions. The Appellant was unsuccessful in his original direct appeal. *State v. Hall*, 976 S.W.2d 121 (Tenn. 1998). The Appellant subsequently pursued post-conviction relief. This Court affirmed the trial court's denial of that relief. *William Eugene Hall v. State*, No. M2005-02959-CCA-R3-PD, 2008 WL 2649637 (Tenn. Crim. App., July 7, 2008). The supreme court, however, has granted the Appellant a delayed appeal. This appeal stems from the original and amended motions for new trial, which the trial court denied. Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and JEFFREY S. BIVINS, JJ., joined.

Patrick T. McNally and Paul J. Bruno, Nashville, Tennessee, for the Appellant, William Eugene Hall

Robert E. Cooper, Jr., Attorney General and Reporter, William E. Young, Solicitor General, and James E. Gaylord, Assistant Attorney General; Dan Alsobrooks, District Attorney General and Robert Wilson, Deputy District Attorney General, for the Appellee, State of Tennessee

**OPINION**

*Overview*

The Appellant and his co-defendant, Derrick Quintero, were each convicted on two counts of felony murder, along with several other burglary and larceny offenses, and both were sentenced to death for one of the two murders. *State v. Hall*, 976 S.W.2d 121 (Tenn. 1998). The trial lasted just over six weeks. The defendants were unsuccessful in their direct appeal. *Id.* They subsequently filed individual petitions for post-conviction relief, which were denied after a joint hearing by the trial court. This Court affirmed the denial of post-conviction relief. *William Eugene Hall v. State*, No. M2005-029590CCA-R3-PD, 2008 WL 2649637 (Tenn. Crim. App. July 7, 2008). The supreme court denied Quintero's Rule 11 application, but granted the Appellant a delayed appeal due to the ineffective assistance of trial counsel during the motion for new trial and direct appeal. No. M2005-02959-SC-R11-PD (Order, Oct. 30, 2009).

This appeal stems from the denial of the original and amended motions for new trial filed by the Appellant. On appeal, he again challenges the sufficiency of the convicting evidence, and also argues a new trial is warranted due to newly discovered evidence. In addition, he contends he was improperly shackled in front of the jury during trial, and he advances a claim of ineffective assistance of trial counsel. The Appellant also argues a new trial is warranted because the judge the supreme court appointed to preside over the case following remand, Judge Allen W. Wallace, died before the hearing on the amended motions for new trial. Senior Judge Jon Kerry Blackwood was appointed to preside over the case following Judge Wallace's death.

*Background*

The Appellant was part of a group of eight inmates who escaped from prison in Eddyville, Kentucky on Thursday morning, June 16, 1988. Three of the escapees were captured near the prison in Kentucky. Five of the escapees, the Appellant, Quintero, James Blanton, Joseph Montgomery and Ronnie Hudson, eventually made their way to a community in Stewart County, Tennessee near Kentucky Lake. Several homes in the area were reported burglarized prior to Monday, June 20, 1988, and the victims in this case were murdered in their home the night of June 20th. Montgomery and Hudson left the other three escapees and returned to Kentucky on Sunday, June 19, 1988, and they spent the next few days with Hudson's family until their arrest on June 22, 1988. The Appellant, Quintero and Blanton fled Stewart County and were seen in Memphis on Tuesday, June 21, 1988. The Appellant was eventually captured in Texas, and Quintero and Blanton were subsequently apprehended in Mexico. Although Blanton was indicted along with the Appellant and Quintero, he

2

successfully moved to sever his case. Blanton also received the death penalty for one of his two murder convictions. *State v. Blanton*, 975 S.W.2d 269 (Tenn. 1998). Blanton died in prison in 1999.

The following summary of the trial testimony is from the supreme court's opinion on the original direct appeal:

The proof introduced by the State during the guilt phase of the trial demonstrated that Myrtle and Buford Vester were murdered in their home in the Leatherwood community of Stewart County, which is situated on Kentucky Lake and in close proximity to the Tennessee-Kentucky border. The Vesters were murdered sometime after their son left their home at 6:00 p.m. on Sunday, June 19, 1988 and sometime before their bodies were discovered by their neighbor around 10:00 a.m. on Wednesday, June 22, 1988.

Along with six other men, the defendants in this appeal, Derrick Quintero and William Hall, escaped from the Kentucky State Penitentiary at Eddyville during the early morning hours of June 16, 1988. Three of the escapees [Bobby Sherman, Leo Sperling, and Floyd Cook] were apprehended in the vicinity of the prison on or before June 18, 1988. However, the other five escapees, including Quintero, Hall, James Blanton, Joseph Montgomery, and Ronnie Hudson left the area in a 1966 Chevrolet pick-up truck which they stole from Curtis Rogers who lived about one-half of a mile from the prison facility. [The truck was located seventeen months after the escape in a wooded area of Stewart County, Tennessee. It had been completely covered with branches.]

The Stewart County Sheriff's department was notified at 2:30 a.m. on June 16 that inmates had escaped from the penitentiary at Eddyville. After news of the escape had been broadcast to the public, the Sheriff's department received a telephone call from Zachery Pallay, a resident of the Leatherwood community, warning that Quintero was familiar with the area and would probably seek refuge there. The Sheriff's department's also received several reports of suspicious individuals in the Leatherwood area including a report of three men attempting to flag down a car. However, when a rash of burglaries broke out in the Leatherwood community, the Sheriff's department became convinced that the escapees were in the area. The burglarized residences in Stewart County were owned by Jim McMinn, Neal Foster, Essie Settles, Alfred Cherry, Thomas Harris, and John and Virginia Crawford.

Though it is not possible to determine from the record the precise order

3

in which the burglaries occurred, the proof demonstrates that five of the six burglaries occurred before 1:00 p.m. on Sunday, June 19, 1988.

The first burglary was reported and occurred on June 18, 1988. That day, Jim McMinn of Clarksville, Tennessee, arrived at his cabin in the Leatherwood area at approximately noon. He left the cabin to go fishing in his boat at around 1:00 p.m. Upon returning to the cabin at 2:30 or 3:00 p.m., McMinn noticed a box of shotgun shells lying on the floor and discovered that his loaded .22 caliber pistol was missing from the bedroom. The telephone in his cabin had been removed from the wall, and the outside portion of the phone line also had been severed. McMinn went to his truck and discovered that the windows had been rolled up and the ignition destroyed with his ax. The telephone from McMinn's cabin was in the bed of the truck.

Following the report of the McMinn burglary on June 18, the Sheriff's Department initiated an intensive search of the area, utilizing helicopters, four-wheel drive vehicles, and tracking dogs. At one point law enforcement officers chased some individuals on foot through the woods, but they were not able to overtake the persons suspected to be the escapees.

At some point, perhaps during that chase, Hudson and Montgomery became separated from the defendants and Blanton. Hudson and Montgomery left the Leatherwood community and drove to Lebanon, Kentucky in a 1982 White Ford Fairmont they stole from Essie Settles, a resident of the Standing Rock Community, which is approximately six highway miles from the Leatherwood community. Montgomery's fingerprint was found on Settles' garage door. Hudson's fingerprint was found inside the car when it was later recovered. Settles had seen the car in her garage around 10:00 a.m. on Saturday morning and discovered that it was missing at approximately 1:30 p.m. on Sunday afternoon. The proof demonstrated that the car was stolen sometime Saturday night or before daylight on Sunday morning. Burned matches were found inside the garage indicating that it had been dark when the theft occurred. In addition, when she watered her flowers around 8:00 a.m. on Sunday morning, Settles noticed that someone had removed the hose from the outside faucet during the night. Settles stated that the hose had been connected when she had used it on Saturday evening around 6:00 p.m.

Hudson and Montgomery arrived at Hudson's brother's apartment in Lebanon, Kentucky on Sunday, June 19, at approximately 1:00 p.m. They were driving a white car with Tennessee license plates, which witnesses identified

4

at trial as the vehicle which had been stolen from Settles. Hudson's brother and a friend accompanied the two escapees to a secluded area on the river where Hudson and Montgomery hid the stolen car among the weeds. Around 6:00 or 6:30 p.m., Hudson's brother left the two escapees in the company of Hudson's mother and sister. The next day, Hudson's sister, her two children, and Martha Grover picked up the two escapees and transported them to Grover's apartment where they stayed until early evening on Tuesday, June 21. The following day, Wednesday, June 22, Kentucky authorities apprehended both Hudson and Montgomery near the location where Settles' car had been hidden. Shots were exchanged prior to the convicts' apprehension. Hudson and Montgomery had in their possession McMinn's .22 caliber pistol and a .22 caliber pistol which had been stolen from another resident of the Leatherwood community, Neal Foster. Two live rounds were recovered from Foster's pistol, and four spent shells were recovered in the area. While this proof demonstrated that Hudson and Montgomery were some two hundred miles away in Lebanon, Kentucky when the Vesters were murdered in Stewart County, Tennessee, it also showed that the McMinn and Foster burglaries occurred before 1:00 p.m. on June 19.

The Cherry and Harris burglaries were discovered around 3:00 or 4:00 p.m. on June 19, 1988 by Alfred Cherry. Cherry's trailer was located approximately one-half of a mile from the murder victims' residence. The inside of the trailer was in disarray. A bed was unmade and wet towels were in the bathroom. The refrigerator light switch had been taped down to prohibit the light from operating when the refrigerator door was opened. The hot water tank had been set on high.

Missing from the trailer were two bedspreads, a green thermal blanket, a sleeping bag, a portable radio, approximately fifteen cassette tapes, a rechargeable flashlight, a small handsaw, six knives, coffee mugs, various canned goods, a gallon of homemade wine, two bottles of bourbon, a six-pack of beer, a toothbrush, underwear, and two paperweights bearing the Cumberland Electric logo. [These paperweights were found seventeen months later in the bed of the 1966 Chevrolet truck which the escapees had stolen near Eddyville and driven to the Leatherwood community.]

Cherry did not have a telephone in his trailer. Upon discovering the burglary, he went next door to call the police on the telephone in the trailer owned by his brother-in-law, Thomas Harris. Cherry discovered that Harris' trailer had also been burglarized. The trailer had been ransacked. The refrigerator light had been removed. The sink was full of dirty dishes, and food

was in a skillet on the stove. Wet towels and sheets were strewn about and cigarette burns were all over the floors. Stolen from the trailer were all the canned food items, two quilts, silverware, butcher knives, towels, toilet articles, and a fishing tackle.

When Harris later received his telephone bill, he realized that several unauthorized long distance telephone calls had been placed from his trailer. Three of the unauthorized calls had been placed to a number in Springtown, Texas. These calls occurred on Sunday, June 19, at 3:51 a.m., 8:55 a.m. and 9:19 a.m. Two additional unauthorized calls were placed to a telephone number in Hopewell, Pennsylvania, at 4:00 a.m. and 9:19 a.m. The telephone number called in Springtown, Texas, was listed to Bryan Quintero, who is a brother of Derrick Quintero. The telephone number called in Hopewell, Pennsylvania, was listed to a Barbara Vasser, William Hall's girlfriend.

At trial, Vasser testified that Hall told her during their first telephone conversation after the escape that his parole had been denied. Hall would not reveal to Vasser his and Quintero's location, but told Vasser that there were helicopters in the area searching for the escapees and that he and Quintero had been separated from Hudson and Montgomery.

Two knives taken from the Cherry trailer were found at Neal Foster's residence indicating that it was burglarized sometime after the Cherry and Harris trailers. Again, however, the burglary occurred sometime before 1:00 p.m on June 19, because Montgomery and Hudson had in their possession a gun which had been stolen from the Foster residence when they were apprehended.

However, Foster did not discover the burglary until Tuesday, June 21. The residence had been ransacked. Food was on a kitchen counter, deer steaks were in the microwave, and his binoculars were sitting on a kitchen counter. A green ammunition box, a plastic bag full of old coins, a flashlight, and the holster for his .22 caliber RG pistol were on the floor of the living room. The hallway floor was littered with a Diet Pepsi can, a tin can of old coins, a notebook that once had old coins in it, some socks, a laundry basket with clothes that did not belong to him, and a pair of white tennis shoes that did not belong to him. Towels were strewn around the house. He found in his bathroom a pocket knife, towels, a pair of socks, a .22 caliber shell box, and a 20 gauge shotgun shell. The beds were unmade and had items spread on top of them. The master bedroom dresser drawers were open, and items were scattered all around the bedroom, including two walkie-talkies, a hacksaw, and

6

a 12 gauge shotgun barrel. In the front bedroom, he found several hats, matchbooks, a jar of marshmallow cream, a box of graham crackers, and a small drinking glass.

In a walk-in closet in the residence Foster had kept a .22 caliber pistol, a Glenfield .22 caliber rifle, a Marlin .30-30 caliber lever action rifle, a 20 gauge shotgun, a single shot shotgun, and a Remington Model 1100, 12 gauge shotgun. Following the burglary, he found the 12 gauge shotgun lying on his bed. Someone had attempted to saw off the barrel and had rendered the gun inoperable. The 20 gauge shotgun was missing from his house, but a portion of the gun's barrel had been sawed off and left in Foster's bedroom. Also missing after the burglary were his .30-30 lever action rifle and ammunition for various weapons, including .30-30 accelerator rifle bullets, .30-30 caliber rifle shells, 20 gauge shotgun shells, and 12 gauge shotgun shells. In addition to the ammunition, several coins which Foster had collected, including silver dollars, were taken in the burglary.

The authorities found several latent prints at the Foster residence, and identified some of them as belonging to the escapees. A latent left thumb print matching that of Quintero was found on a full box of Federal 12 gauge shotgun shells. A latent right ring fingerprint matching that of Quintero was found on another Federal 12 gauge shotgun shell box. A right middle finger and a right index fingerprint matching Blanton's print was found on a Federal field load 12 gauge shotgun shell box. A right palm print matching that of Quintero was lifted from one of the gun barrels. A latent right ring fingerprint matching that of Hall was lifted from a Diet Pepsi can.

Though the Crawford burglary was not discovered until after the Vesters' bodies had been discovered, a glove taken from the Crawford residence was found at the home of the murder victims, indicating that the burglary actually occurred before the murder. The Crawford residence was less than a quarter of a mile from the Vesters' home. John and Virginia Crawford had left their trailer, clean and orderly, around 2:00 p.m. on Sunday, June, 19. Following the burglary, they found their kitchen ransacked. Canned foods, crackers, and candy bars from the cabinet and refrigerator had been eaten. Prints were lifted from several items in the trailer. A latent left thumb print matching that of Hall was found on the bottom of a can of ham. A latent right index fingerprint left by Blanton was lifted from a Butterfinger candy wrapper found inside the refrigerator. The Crawfords identified two gloves found at the trailer, one white jersey and one brown jersey, as belonging to Mrs. Crawford.

7

A patch on one of the gloves had been sewn on by Mrs. Crawford. Mr. Crawford testified that a flashlight had also been taken from the trailer. One of the gloves found at the Crawfords' trailer matched a glove found outside the Vesters' front bedroom window. A fiber analysis of the two gloves indicated that they were likely originally sold together as a pair.

With respect to the timing of the murder, the proof showed that late on Monday evening, June 20, John Corlew and Arthur Jenkins arrived at the Leatherwood boat dock, launched their boat, and night fished in the Leatherwood Bay. Between 11:00 p.m. and 12:00 a.m. they heard five gunshots emanating from the direction of the Vesters' residence. Corlew testified that he first heard two gunshots that were fairly clear, and after a pause, he heard two additional shots, another pause, and one final shot. Corlew testified that the first two shots and the second two shots sounded as if they were from different weapons. Mr. Jenkins testified that the two initial shots sounded like repercussions from a pistol. Both Jenkins and Corlew heard a total of five gunshots.

The victims, Buford and Myrtle Vester, were last seen alive around 6:00 p.m. on Sunday June 19 by their son Wayne. He, along with his twelve-year-old son, had arrived at his parents' home for a weekend visit on the evening of Friday, June 17. He had picked up groceries for his parents including Pepsi colas, lunch meat, bread, and milk. Wayne Vester left his parents home on Sunday, June 19, at approximately 6:00 p.m. At that time, the Vesters were alive and well. Wayne attempted, unsuccessfully, to reach his parents by telephone once on Monday, June 20, and twice on Tuesday, June 21. Concerned, Wayne called their neighbor, Howard Allor, who lived approximately one quarter of a mile from the Vesters, but Allor had not seen them since the preceding Friday morning. When Wayne was still unable to reach his parents on June 22, he again called Allor and asked him to check on them. Allor drove to the Vesters' residence and discovered their dead bodies. He attempted to telephone the Sheriff from their residence, but the telephone was not functioning, so he returned home and reported the murders to the authorities.

David Hicks, Sheriff of Stewart County, was notified of the Vester murders at approximately 1:00 or 1:30 p.m. on Wednesday, June 22. The Tennessee Bureau of Investigation ("T.B.I.") conducted the primary investigation of the crime scene. The only entrance to the Vester residence was a screen door located at the side of the house opposite to the victims' bedrooms. The screen door had not been damaged. However, the front window

8

was open, and the screen from the front window was lying on the ground near Myrtle Vester's bedroom window which was located at the back of the house. Underneath the front window was a concrete block which apparently had been taken from the front of a shed located at the back of the house. A cloth glove which matched a glove found at the Crawfords' residence was found on the ground beside the concrete block. An unopened Pepsi cola can lay next to the walkway to the screen door of the house. The packages of Pepsi cola that Wayne Vester had brought his parents were missing from the porch. The Vesters' maroon 1985 Pontiac Bonneville also was missing. The wires to the telephone connection box outside the Vesters' residence had been damaged and the line was dead. A live 20 gauge Federal shotgun shell with number 6 bird shot was found lying near the electrical box. A spent 20 gauge number 4 shot Federal shotgun shell casing was found near the shed approximately 18 feet from Mr. Vester's back bedroom window.

The windows to the victims' bedrooms were located along the back of the house. Buford Vester's bedroom window frame was visibly bent. The screen covering the window had a hole in it which indicated that Mr. Vester was shot at least once from outside the house. Some the glass louvers were broken, and shards of glass were found lying on the bed. Mr. Vester's body was found on the floor next to his bed. The covers were drawn back, and blood was on both the pillow and the bed. Number 4 and 5 bird shot pellets were retrieved from Mr. Vester's room. Two shot shell filler wads were found beside Mr. Vester's body, and a 20 gauge plastic shot wad was recovered from beside his head. A plastic shot sleeve, one shot shell, a plastic shot wad, and several shot pellets, all either number 4 or 5 bird shot, were recovered from Mr. Vester's body.

The victims were in separate bedrooms joined by a bathroom. Myrtle Vester's body was found lying in a pool of dried blood on the floor of her bedroom next to the bathroom. Mrs. Vester had been shot three times, once with a 20 gauge shotgun, once with a high-powered rifle, and once again with either a shotgun or a high-powered rifle. She also had been stabbed thirteen times. A copper-jacketed bullet was recovered from her body. Blood was found on Mrs. Vester's bed, and a considerable amount of blood was found on the bathroom floor. Blood was splattered on both the bathtub and the commode, and the bottoms of Mrs. Vester's feet also were covered in blood. The screen covering Mrs. Vester's bedroom window also had a hole in it, indicating that at least one shot had been fired from outside. The open and unbroken condition of the glass louvers indicated that the high-powered rifle

or shotgun had been near the window when it was fired. Shot was sprayed all over the house, especially the kitchen. All of the shot pellets found in the house were either number 4 or 5.

On the victims' sofa authorities found a portion of *The Tennessean,* dated Monday, June 20, 1988. The local mail carrier testified that the victims did not receive *The Tennessean* by mail. A live 20 gauge shotgun shell with number 7.5 shot was found lying on the floor in the front bedroom next to a ransacked jewelry box.

Dr. Charles Harlan, the medical examiner, performed an autopsy on each victim and testified that the Vesters had died within two hours of consuming dinner. He stated that the victims had been shot a total of five times, and a minimum of three different weapons had been used to murder them.

Mrs. Vester had sustained three gunshot wounds. Gunshot wound A, located at the right portion of Mrs. Vester's chest just below her collarbone, measured approximately a quarter of an inch and was basically round in shape. This wound resulted when a copper jacketed bullet entered Mrs. Vester's body and lodged in her left arm. Wound B resulted from a shotgun blast and was located in the upper arm. This wound measured 3.4 inches by 1.8 inches, was jagged, with an irregular edge, and had multiple associated tangential abrasions. Wound C resulted from either a high-velocity rifle or shotgun. This gunshot blast had severed the two bones in Mrs. Vester's right forearm, leaving her hand and wrist attached to her body by a piece of tissue, consisting of only skin, muscle, and fat. Dr. Harlan could not determine the order in which these three gunshot wounds were inflicted.

Mrs. Vester also had sustained thirteen stab wounds, one to the middle of her back and twelve to her head, neck, and shoulder region. A majority of the stab wounds were inflicted to the left side of her head and neck. Dr. Harlan surmised that the puncture wounds were made by a squared object with a sharp edge, such as a kitchen or hunting knife. Two of the stab wounds severed her right and left common carotid arteries. The right carotid artery was 90 percent severed, and the left was 10 percent severed. Dr. Harlan testified that either the injuries to her carotid arteries or the gunshot injury to her right forearm would have been fatal. Dr. Harlan determined that Mrs. Vester could have survived the brutal attack for up to 15 minutes.

Mr. Vester had sustained two gunshot wounds. Shotgun wound A was

10

located at the head and neck juncture. The total dispersal pattern of shotgun pellets was 13 inches. Wound A caused significant injury to his left lung, aorta, and pulmonary artery. Shotgun wound B was to Mr. Vester's right breast and caused trauma to his right lung and to his liver. Dr. Harlan recovered shotgun pellets and a shot column from Mr. Vester's chest and abdomen. Dr. Harlan opined that Mr. Vester could have survived from four to twelve minutes after sustaining the gunshot injuries.

On June 21, 1988, around 8 a.m., employees of the Memphis Funeral Home observed three men, in a maroon Pontiac which was later identified as the victims' car, enter the funeral home parking lot and park the car approximately 250 feet from the building. Two employees of the funeral home testified that one man got out of the front seat, took his tank top off, and put on three additional shirts. The two other men also exited the car. None of the witnesses could make a positive identification of the three men. The witnesses testified that all three men were white and about the same height, but two of the men were approximately 180 pounds and had darker hair. They stated that all three men had facial hair. One funeral home employee described the three men as having beards and stated that one had long hair.

The three men remained in the parking lot for approximately five to eight minutes. Then, after one of them took something out of the trunk, the three men walked towards a hospital across the street from the funeral home. One of the men turned, walked back to the car, and appeared to have placed an item back into the car. He then joined the two other men, and then all three walked away. The funeral home employees assumed that the three men were working on a construction project at the hospital. However, when the car had not been removed by Thursday, the funeral home employees contacted the Memphis Police Department.

On the morning of Thursday, June 23, the Memphis Police Crime Scene Squad responded to the call from the Memphis Funeral Home. The police found a 1985 maroon Pontiac Bonneville in the funeral home's parking lot. The vehicle matched the description of the victims' vehicle. The keys were in the car's ignition. The officers found a sawed-off 20 gauge shotgun containing one live round under the floor mat behind the driver's seat which was later identified as the weapon stolen from the Foster residence, and as the weapon from which a spent shell found outside the Vesters' residence had been fired. Foster was able to identify the weapon by its serial number; however, the gun also had Foster's full name carved into it. The police also discovered under a

11

floor mat a .30-30 caliber cartridge which matched ammunition that had been taken from the Foster residence. From a crumpled Budweiser beer can which also was found under the back seat police were able to lift three latent prints belonging to Blanton. No other prints were found in the car. The officer noted that the extremely hot temperatures in Memphis at the time the car was found made it difficult to lift intact prints. Other items retrieved from the vehicle included a Ray-O-Vac flashlight, similar to one taken from the Crawford residence, electrical tape, thirteen 20 gauge shotgun shells, three 12-ounce Pepsi colas, one 12-pack of Pepsi colas, a portable electric air compressor, a Black & Decker car vacuum, and a brown umbrella.

Curtis Jones, who was a security guard at the Memphis Greyhound bus station, testified that he worked Tuesdays and Wednesdays at the bus station in June of 1988. The bus station, located in downtown Memphis was approximately one mile from the Memphis Funeral Home. His job was to prevent loitering at the bus station. Mr. Jones sat in a booth and observed people who came inside to determine whether they purchased tickets. Periodically, he would walk around and ask people whether they had tickets or if they were waiting for someone to arrive.

Mr. Jones recalled three men entering the bus station either Tuesday, June 21, or Wednesday, June 22, between 11 a.m. and 1 p.m. Two of the men sat down and watched television. One of the two seated men spoke to a man seated nearby. The third man, who had darker skin and appeared Hispanic, used a telephone. Mr. Jones approached the two seated men and asked them whether they had tickets. A man, whom he identified as Blanton, told him that they would leave as soon as their friend finished using the telephone. The three men remained in the station five to ten minutes. Later that same day, the Memphis police stopped by the bus station with a photographic line-up of the eight escapees. Jones responded that Blanton and Hall had previously been at the station. Later in the week, Jones spoke with T.B.I. Agent Stout. Jones identified Blanton and Hall from a photographic line-up and made an in-court identification of Hall as one of the men at the bus station.

The Blue Movies West adult bookstore and entertainment center was located across the street from the bus station. Shirley Denise Morrow testified that she worked as a cashier in the bookstore in June of 1988. On Tuesday, June 21, the day before her birthday, three men entered the bookstore around 9:00 or 10:00 a.m. Two of the men were white, and one appeared Mexican. The men traded a few silver dollars and half dollars for tokens. Morrow also

purchased some of the silver dollars and half dollars for herself.

The men went to the back of the establishment to watch movies. Darlene Christof, a dancer at the establishment, testified that three "scruffy" men entered her booth on June 21. Two of the men were white, and the other appeared either Hispanic or Mexican. Ms. Christof informed the men that only one was allowed to remain in the booth. Two of the men left. From a photographic line-up, she identified the man who remained in her booth as Quintero. Quintero later gave her several silver dollars and tried to sell her a class ring and a man's wedding band.

The men then returned to the front of the establishment approximately fifteen to twenty minutes later. They attempted to sell Morrow what appeared to be a class ring and a wedding band. Morrow declined and suggested they try a pawn shop. One of the men indicated that they did not have any identification and offered Morrow fifty dollars if she would allow them to stay in the movie house until their transportation arrived. Morrow declined their offer. Christof then came out from the back of the establishment and pretended to use the telephone. When Christof commented that the three men resembled the escapees from the Kentucky prison, they left. Morrow then contacted the police.

When shown a pre-trial photographic array of the eight escapees, Morrow identified Blanton, Quintero, and Hall as the three men who had visited the bookstore. Morrow turned over to the authorities the six silver dollars she had purchased from the men, and later, Foster identified the coins as those stolen from his residence. Morrow also made an in-court identification of both Quintero and Hall.

Lt. Thomas Pryor, an employee at the Eddyville penitentiary, testified that Quintero had long hair, a moustache, long side burns and a goatee prior to the escape. Lt. Pryor stated that he had never seen Hall with a beard.

Hall was eventually captured in El Paso, Texas. Both Blanton and Quintero were captured in Mexico near El Paso. Barbara Vasser, Hall's girlfriend at the time, testified that her mother called the Pennsylvania State Police after Hall called her for a third time following the escape. Afraid for Hall's safety, Vasser notified the authorities that she had agreed to wire money to him at the Western Union on North Stanton Street in El Paso, Texas. Hall was apprehended by agents of the Federal Bureau of Investigation ("F.B.I.")

when he entered the Western Union in El Paso at approximately 2:20 p.m. on July 6, 1988.

On July 10, 1988, Quintero and Blanton were apprehended by Mexican officials at the Santa Fe Hotel in Juarez, located just across the border from El Paso, Texas, and transported across the international bridge. F.B.I. agents took custody of both Quintero and Blanton from Mexican officials at a border checkpoint. Found in Quintero's possession when he was taken into custody was an old wallet bearing an imprint of Neal Foster's driver's license.

Based upon the proof summarized above, the jury convicted both Hall and Quintero of two counts of murder during the perpetration of first degree burglary, three counts of grand larceny, one count of petit larceny and three counts of first degree burglary.

*Hall*, 976 S.W.2d at 124-32.

Although the evidence in this case was wholly circumstantial, the supreme court affirmed this Court's conclusion that the convicting evidence was sufficient. *Id*. at 140-141.

*Alleged Newly Discovered Evidence*

In his amended motions for new trial, the Appellant argues that his own post-conviction and motion for new trial testimony, the testimony of two of his fellow inmates, and the deposition of Quintero's father, in addition to the record of a pay telephone at the Greyhound Bus Station in Memphis reflecting that a call was placed at 11:33 p.m. on June 20, 1988, to a telephone in the same area code in Texas where Quintero's brother lived, represent newly discovered evidence of his innocence. Accordingly, Judge Blackwood agreed to review some of the evidence proffered in support of the Appellant's post-conviction and error coram nobis petitions. This alleged newly discovered evidence is summarized below.

The Appellant was the only witness who testified at the hearing on the motion for new trial. His testimony is basically the same as his testimony at the post-conviction hearing wherein he claimed he was in Memphis the day the victims were killed. *See Hall*, 2008 WL 2649637 at 20-21. The Appellant said Quintero's father dropped off him and Quintero at the Greyhound station in Memphis around 10:00 or 11:00 a.m. on June 20th. The Appellant testified that Quintero placed a call from a pay phone at the Greyhound station around 11:30 p.m. that same night. The Appellant could not adequately explain why Mr. Quintero drove all the way from Texas to Nashville to pick up the Appellant and Quintero, then drop them

off in Memphis on his way back to Texas (instead of driving them to Texas too, which is closer to their planned final destination in Mexico), other than to state that he and Quintero had an arrangement with Blanton and Hudson to meet in Memphis before fleeing to Mexico. The Appellant testified that Mr. Quintero could not wait around for Blanton and Hudson to show up in Memphis because he had business to attend back in Texas. The Appellant testified that he did not inform his trial attorneys about his alleged alibi because he was not paying attention during trial, and he did not think the dates were relevant. According to the Appellant, "I didn't know I had an alibi."

The Appellant filed a petition for a writ of error coram nobis the day the post-conviction hearing commenced. The basis of the petition was the testimony of two fellow death row inmates who stated that Blanton confessed to them that he acted alone, or with another individual, when he broke into the victims' home and killed them. According to these inmates, Blanton told them he did not come forward earlier because he did not want to jeopardize his own case. Blanton died in prison in 1999.

Ronnie Cauthern, an inmate on death row in Tennessee, knew James Blanton prior to his death in 1999. Cauthern testified about statements Blanton made to him concerning the crimes in this case. According to Cauthern, Blanton said the Appellant and Quintero were not present when Blanton killed the victims. Blanton also said "if anything were to happen regarding the execution of [the Appellant and Quintero], he would step up and stop it," but would not say anything "at that time, because it would jeopardize his own case." Blanton had previously been convicted of murder, and according to Cauthern, he bragged about the killings.

Terry Lynn King, another death row inmate, also testified that Blanton told him the Appellant and Quintero were not present when the murders took place. Blanton "was somewhat troubled of [sic] whether he was going to testify at [the Appellant's and Quintero's] post-conviction hearing," but when King informed Blanton it would be his only opportunity to help the Appellant and Quintero, he decided he would testify on their behalf. According to King, Blanton "felt really bad" that the Appellant and Quintero were on death row for something he did.

King described the crimes as told to him by Blanton: Blanton, Montgomery and Hudson thought they had been spotted after breaking into a trailer, so they went to tell the Appellant and Quintero what happened. The Appellant and Quintero had set up a separate camp from the other three escapees. Quintero told Blanton that he and the Appellant were going to meet his friend Zach later that night. After Blanton and the other two thought they had been seen breaking into a trailer, all five of the escapees broke into another home looking for guns and more supplies. Blanton told King that Quintero sawed off a shotgun, but that

they all fled the house when they thought they saw a police officer. The Appellant did not have a weapon in his hands when they fled, but Quintero had a rifle. Quintero and the Appellant ran off in a different direction than Blanton, Montgomery, and Hudson. Later that night, Blanton, Montgomery and Hudson tried to stop a couple of cars on a roadway but eventually ran off into the woods after they saw a patrol car.

The night after all five escapees fled from the house where they stole the guns, Blanton went to the location where Quintero said they would meet his friend Zach. Zach eventually appeared and told Blanton that he drove Quintero and the Appellant to meet Quintero's father in Nashville earlier that day. Zach asked Blanton where the other two (Montgomery and Hudson) were, and Blanton told him how they became separated after seeing the police car. Blanton asked Zach for a ride out of the area, but Zach was reluctant to aid Blanton. However, Zach apparently told Blanton where he could find a car and some money to steal. Zach took Blanton to the Vester's home. Blanton told King that the man "put up a fight" so he "had to kill him." Zach was with Blanton at the time, but Blanton did not explain Zach's role in the murders, if any. Blanton rendezvoused with the Appellant and Quintero in Memphis at the bus station, which was their plan if they became separated.

King testified that he did not know Zach's last name. During his testimony, King referred to "these people's house," but he only mentioned that a man was killed. He never mentioned a woman having been killed. Nor did he mention the number or types of weapons used. King stated that the only information he received about the facts of this case came from Blanton. He testified he never read the appellate court opinions. King also testified that he never discussed the matter with Cauthern.

The deposition testimony of Celerino Quintero was as follows: Mr. Quintero had lived at the same address in Spring Town, Texas since 1981 or '82. In the early morning hours on Sunday, June 19, 1988, Mr. Quintero received two calls from the Appellant. During the first call, the Appellant asked Mr. Quintero if he had seen his son in the last day or so. The Appellant stated that he and Quintero became separated. During the second call, the Appellant stated that he had since found Quintero. When asked why his son did not call him instead of the Appellant, Mr. Quintero testified he did not know. The Appellant did not say where Quintero was when the Appellant made the phone calls. During the second call, the Appellant stated they had escaped from prison and asked Mr. Quintero to meet them at "the old truck stop in Nashville." Mr. Quintero left Texas that morning at approximately 8:30 a.m., drove about fourteen hours, and arrived at the truck stop around midnight. Mr. Quintero fell asleep after he arrived, but was awakened before sunrise Monday morning by his son, the Appellant, and Zach Pallay.

16

Quintero told his father they had to meet someone at the Greyhound bus station in Memphis. Mr. Quintero insisted that he drive them to Memphis, rather than Pallay. Mr. Quintero did not think much of Pallay because of things that happened when his son and Pallay were younger. When Mr. Quintero asked his son why Pallay drove them to Nashville, Quintero said there was no one else he could call and he did not want Mr. Quintero to be seen in the Leatherwood community with Texas license plates. When they arrived in Memphis, Mr. Quintero dropped off the Appellant and Quintero about seven or eight blocks from the station. Mr. Quintero wanted to take the Appellant and Quintero back to Texas with him, but they informed Mr. Quintero that they were supposed to meet someone in Memphis.

Mr. Quintero did not learn of the murders until after he returned home to Texas. Mr. Quintero testified he was never contacted prior to trial by either the Appellant's or Quintero's attorneys or investigators. According to Mr. Quintero, though he would have testified on his son's behalf, his son was adamant that he not get involved in the matter. Although he knew a trial was scheduled, Mr. Quintero stated that he did not know the actual date of the trial. Mr. Quintero admitted that his son contacted him numerous times from prison after he was arrested for the murders in this case.

*Issues*

I.      Role of Successor Judge

The Appellant argues that Judge Blackwood should have automatically granted a new trial following the death of Judge Wallace, the original trial judge. At the time of the offenses and the trial of this case, Tennessee Code Annotated Section 17-1-305 (1980) provided as follows:

> Whenever a vacancy in the office of trial judge shall exist by reason of the death of the incumbent thereof, or permanent insanity, evidenced by adjudication, after verdict but prior to the hearing on the motion for new trial, a new trial shall be granted the losing party if the motion therefor shall have been filed within the time provided by rule of the court and be undisposed of at the time of such death or adjudication.

That section was modified in 1994. *See* 1994 Pub. Acts, c. 833, §1. The current version of the statute provides as follows:

> When a vacancy in the office of trial judge exists by reason of death, permanent insanity as evidenced by adjudication, impeachment and conviction under Tenn. Const. art. V, or removal under Tenn. Const. art. VI, § 6, after

verdict, but before the hearing of the motion for new trial, the trial judge's successor shall rule on the defendant's motion for new trial after the successor judge has reviewed the transcript and entire record of the trial.

Tenn. Code Ann. § 17-1-305 (2009). According to the Appellant's argument, ex post facto considerations demand that a new trial be granted as required by the version of Section 17-1-305 in effect at the time of the offenses and trial in this case.

> [S]tatutes are presumed to operate prospectively. However, statutes that are remedial or procedural in nature may be applied retroactively to causes of action arising before the acts became law and to suits pending when the legislation took effect. Remedial statutes are defined as '[l]egislation providing means or method whereby causes of action may be effectuated, wrongs redressed and relief obtained.' Similarly, a procedural statute is one that addresses the mode or proceeding by which a legal right is enforced.

*State v. Hanners*, 235 S.W.3d 609, 612 (Tenn. Crim. App. 2007) (internal citations omitted). Applying a statute retroactively in a criminal case may, however, implicate constitutional prohibitions against ex post facto laws, which are forbidden under both the United States and Tennessee Constitutions. *See* U.S. Const. art. 1, § 10, cl. 1 ("No State shall . . . pass any . . . ex post facto Law. . . ."); Tenn. Const. art. I, § 11 ("[L]aws made for the punishment of acts committed previous to the existence of such laws, and by them only declared criminal, are contrary to the principles of free Government; wherefore no Ex post facto law shall be made.").

> An ex post facto violation under article I, section 11 of the Tennessee Constitution occurs whenever a law (1) "provides for the infliction of punishment upon a person for an act done which, when it was committed, was innocent," (2) "aggravates a crime or makes it greater than when it was committed," (3) "changes punishment or inflicts a greater punishment than the law annexed to the crime when it was committed," (4) "changes the rules of evidence and receives (sic) less or different testimony than was required at the time of the commission of the offense in order to convict the offender," and (5) "in relation to the offense or its consequences, alters the situation of a person to his disadvantage."

*State v. Odom*, 137 S.W.3d 572, 582 (Tenn. 2004) (quoting *Miller v. State,* 584 S.W.2d 758, 761 (Tenn.1979)).

The Appellant argues that the fifth circumstance applies in his case, i.e., depriving him of an automatic new trial directly relates to the consequences of his conviction and alters his situation to his extreme disadvantage. Obviously, every criminal defendant convicted of a charged offense would argue that he or she is extremely disadvantaged if a new trial is not granted. The Appellant's situation in this case has not been altered to his disadvantage, however. The law still allows a successor judge to grant a new trial if the judge concludes that he or she is unable to adequately perform the duties of a thirteenth juror. The granting of a new trial is just no longer automatic, but the authority for a successor judge to grant one remains in place. The Appellant merely disagrees with Judge Blackwood's conclusion about his ability to review the evidence in this case.

As the State correctly argues, however, the procedure set forth under the current laws does not affect the substantial rights of the Appellant.

> [T]he prohibition of ex post facto laws does not extend to every change of law that "may work to the disadvantage of a defendant." Instead, it is intended to secure "substantive personal rights" from retroactive deprivation and does not "limit the legislative control of remedies and modes of procedure which do not affect matters of substance." Thus, laws which change rules of procedure but which do not affect any substantial right of a defendant are not ex post facto laws.

*State v. Pike*, 978 S.W.2d 904, 926 (Tenn. 1998) (quoting *Dobbert v. Florida*, 432 U.S. 282, 293 (1977)). The change in the law regarding a successor judge's ability to rule on a motion for new trial does not relate directly to the charged offenses or their consequences, i.e., punishment. Accordingly, the Appellant's ex post facto argument must fail.

A successor judge now has the discretion to determine whether or not he or she can perform the duties required of a thirteenth juror. Tennessee Rule of Criminal Procedure 25(b) addresses situations when the trial judge is unable to perform post-verdict duties due to absence, sickness, death, or other disability. The rule provides, in pertinent part, as follows:

(b) After Verdict of Guilt. –

(1) In General. – After a verdict of guilty, any judge regularly presiding in or who is assigned to a court may complete the court's duties if the judge before whom the trial began cannot proceed because of absence, death, sickness, or other disability.

19

(2) Granting a New Trial. – The successor judge may grant a new trial when that judge concludes that he or she cannot perform those duties because of the failure to preside at the trial or for any other reason.

Tenn. R. Crim. P. 25(b). Rule of Criminal Procedure 33(d) provides that a "trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This rule "is the modern equivalent to the 'thirteenth juror rule,' whereby the trial court must weigh the evidence and grant a new trial if the evidence preponderates against the weight of the verdict." *State v. Blanton,* 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). In *State v. Carter,* the supreme court interpreted this rule as "impos[ing] upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case[.]" 896 S.W.2d 119, 122 (Tenn. 1995). The supreme court also held that "approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." *Id.* "[A] successor judge's consideration, pursuant to Rule 25(b) . . . of whether the duties of the original judge can be met must include an assessment of his or her ability to act as a thirteenth juror, including witness credibility." *State v. Nail,* 963 S.W.2d 761, 765 (Tenn. Crim. App. 1997) (citing *State v. Bilbrey,* 858 S.W.2d 911, 914 (Tenn. Crim. App. 1993)). Accordingly, if the successor judge does not believe he or she can adequately determine whether the evidence supports the verdict from a review of the record, the judge may order a new trial.

Judge Blackwood recognized that in order for him to assess whether he could perform the duties of a thirteenth juror he "'would need to determine the extent to which witness credibility was a factor in the case and the extent to which he had sufficient knowledge or records before him in order to decide whether the credible evidence, as viewed by [him], adequately supported the verdict.'" *State v. Brown*, 53 S.W.3d 264, 275 (Tenn. Crim. App. 2000) (quoting *Nail*, 963 S.W.2d at 766). To that extent, if he was unable to make those determinations, he could not approve the verdict and must, instead, grant a new trial. *State v. Biggs*, 218 S.W.3d 643, 654 (Tenn. Crim. App. 2006). As this Court has recognized, "a judge whose first exposure to the case was presiding over the motion for new trial could rule on the motion if the record was available so long as witness credibility was not an overriding issue." *State v. Gillon*, 15 S.W.3d 492, 502 (Tenn. Crim. App. 1997). In other words, "[w]hen witness credibility is the primary issue raised in the motion for new trial, the successor judge may not approve the judgment and must grant a new trial." *Biggs*, 218 S.W.3d at 654.

In denying the motions for new trial, Judge Blackwood ruled as follows:

> The Defendant asserts that credibility is an overriding issue and thus this Court may not act as thirteenth juror. The State disagrees. This Court has

20

carefully reviewed the record and finds that credibility is not an overriding issue and thus this Court may act as thirteenth juror.

Pursuant to this Court's mandatory duty to serve as the thirteenth juror in every criminal case it hears, *see State v. Carver*, 896 S.W.2d 119, 122 (Tenn. 1995) (also concluding that "approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment"), I have considered and weighed the evidence in this matter and find that I agree with the jury about the weight of the evidence and accordingly adopt their verdicts. Stated otherwise, I find that the weight of the evidence supports the verdicts, both as to the defendant's guilt on the various charges and the sentence which the jury imposed.

In addition, this Court notes that Judge Wallace also previously ruled as thirteenth juror in these cases. In addition to his original denial of the motion for new trial, Judge Wallace approved the verdicts and sentences in the Tennessee Supreme Court Rule 12 report filed following the trial in this matter.

The employees of the funeral home in Memphis who observed three men arrive in the victims' vehicle on June 21, 1988, and whose testimony the Appellant now asserts presents credibility concerns, could not positively identify any of those three men. The Appellant does not question the credibility of the other witnesses who actually identified him being in Memphis after the murders. The Appellant argues the credibility of Zach Pallay's trial testimony is now called into question because the Appellant has since stated that Pallay drove him and Quintero to Nashville to meet Quintero's father. However, because Judge Blackwood did not give any credence to the Appellant's recent testimony, as will be discussed below, the Appellant's argument in that respect is without merit. The Appellant also argues the credibility of the witnesses who testified about his beard, or lack thereof, and the law enforcement personnel who collected and processed evidence from the crime scene were critical to the sufficiency analysis. Other than identifying these witnesses in his brief, however, the Appellant does not explain exactly why or how their credibility is now called into question. Again, the Appellant was the only witness who testified at the hearing on the amended motions for new trial. Like Judge Blackwood, we do not believe the credibility of the trial witnesses was an overriding issue. This Court's previous summary of the sufficiency of the evidence, as affirmed by the supreme court, is presented here for sake of reference:

In short, the state's theory in this case was that these crimes were inextricably intertwined. The evidence showed that all of the burglaries occurred within a 2-mile radius and were committed between June 16 and June

21, 1988. Two knives taken from the Cherry residence were found at the Foster residence. Three knives from the Cherry residence were never recovered. At the Harris residence (next door to the Cherrys'), phone calls were made within that time period to appellant Hall's former girlfriend in Pennsylvania and to a Bryan Quintero in Texas. At the Crawford residence, appellant Hall's fingerprint was found on a ham can that was sitting on the table. Other items from the Crawfords' house were connected to the appellants at the Vester crime scene.

Moreover, at the Foster residence, appellant Quintero's fingerprints were found on a Federal 12 gauge shotgun shell box, and his palm print was found on the barrel of a 12 gauge sawed-off shotgun. Appellant Hall's fingerprint was found on a Diet Pepsi can at Mr. Foster's house. At the Vester residence, ammunition similar to that taken from the Foster residence was found, including three live Federal 20 gauge shotgun shells and one casing. Pellets and shot wads removed from the residence and the victims' bodies were also consistent with the ammunition stolen from the Foster residence. Although not recovered, Mr. Foster testified that a .30-30 caliber rifle was stolen from his house. There was testimony that one of Mrs. Vester's gunshot wounds was consistent with having come from such a weapon. Also, a glove, belonging to (and positively identified by) Mrs. Crawford, was found outside the Vesters' front window.

The proof also connected the appellants to the Vesters' 1985 maroon Pontiac Bonneville which was later recovered in Memphis. In the car, the police found a sawed-off 20 gauge shotgun, which was positively identified by Mr. Foster. T.B.I. Agent Don Carmon identified this shotgun as having fired the spent 20 gauge shotgun shell found outside Mr. Vester's bedroom window. The Crawfords also testified that the flashlight found in the vehicle was exactly like the one taken from their home. Finally, three eyewitnesses saw similar looking men get out of the Vesters' vehicle at the Memphis Funeral Home. Then, an eyewitness placed appellant Quintero in Memphis at the time the Vesters' vehicle was abandoned. Two eyewitnesses also placed appellant Hall in Memphis at that time.

*Hall*, 976 S.W.2d at 140-41.

Judge Blackwood affirmatively stated that he was able to perform his duties as thirteenth juror. Accordingly, he found that the weight of the trial evidence supported the verdicts. Judge Blackwood stated that any witness credibility concerns could be attributed

solely to the alleged newly discovered evidence presented by the Appellant in his amended motions for new trial. To the extent the Appellant claims the evidence supporting his later-arising alibi claim presented a challenge for Judge Blackwood, that evidence will be analyzed under the standard discussed in the next section. The role of the successor judge and the impact of the alleged newly discovered evidence must be considered separately. If the successor judge rejected the newly discovered evidence, even though he agreed to review it before analyzing its significance, then any impact it may have had on the credibility of the trial witnesses cannot be considered to have affected his ability to serve as thirteenth juror. Based upon our review, we hold that Judge Blackwood did not err in concluding that he was able to fulfill his duties as thirteenth juror.

II.     Newly Discovered Evidence

The Appellant asserts that the newly discovered evidence summarized above warrants a new trial in this case. In order to be entitled to a new trial on the basis of newly discovered evidence, a defendant must show (1) that he or she was reasonably diligent in seeking the evidence, (2) that the evidence is material, and (3) that the evidence is likely to change the result of the trial, i.e., credible. *State v. Nichols,* 877 S.W.2d 722, 737 (Tenn. 1994). A defendant must satisfy all three of these elements. *Id.* Moreover, the decision to grant or deny a new trial on the basis of newly discovered evidence rests within the sound discretion of the trial judge. *State v. Caldwell,* 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997). Accordingly, this Court's standard of review on appeal is abuse of discretion. *See State v. Meade,* 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996).

> Prisoners are "tireless in seeking new trials on the ground of newly discovered evidence." However, the courts view these efforts with great caution because they are clouded by concerns of fabrication, perjury, and fraud. While courts must always be ready to correct errors in their judgments, they must also take steps to safeguard against the defeated party belatedly manufacturing evidence in order to escape the consequences of an adverse verdict.

*Harris v. State*, 301 S.W.3d 141, 151 (Tenn. 2010) (Koch, J., concurring) (citations omitted). We find this language on the issue especially relevant in this case. New evidence offered in support of a motion for new trial must actually have been *discovered* after trial. A defendant must explain why it was not discovered before trial, and, more importantly, he or she must not have known about the evidence beforehand. Finally, the newly discovered evidence must be credible. "[B]efore relief may be granted, it must be established, and the trial court must find, that the newly discovered evidence may have resulted in a different judgment had it been presented at the trial. This rule presupposes that the evidence would be admissible pursuant to the applicable rules of evidence and is material to the issues or grounds raised in

23

the petition." *Newsome v. State*, 995 S.W.2d 129, 135 (Tenn. Crim. App. 1998) (citing *State v. Hart*, 911 S.W.2d 371 (Tenn. Crim. App. 1995)). As this Court has stated, "[t]he trial court may determine the credibility of any newly discovered evidence, and if the court concludes that the evidence would not be worthy of belief by the jury, the court should deny the motion for new trial." *State v. Bowers*, 77 S.W.3d 776, 784 (Tenn. Crim. App. 2001) (internal quotation omitted).

Judge Blackwood found that the fact a telephone call was placed at 11:33 p.m. on June 20, 1988, to an unknown number in the same area code in Texas where Quintero's family lived does not establish an alibi for the Appellant. He further found,

> [Trial counsel] testified that the co-defendants, Hall, Quintero, and Blanton, would not make statements which would hurt the other. The Defendant admitted to knowing that the offenses occurred between the 18th and the 22nd. The Defendant was always aware of his whereabouts during that time frame and, if true, he was aware that co-defendant Quintero's father had driven them to Memphis. The Defendant never advised his counsel of his potential alibi to at least part of the offenses. The Defendant made a choice not to pay attention during his trial. Assuming that information is true, co-defendant Blanton's testimony was unavailable, not undiscovered. As co-defendant Blanton is now deceased, the testimony of inmates Cauthern and King would be inadmissible hearsay. Clearly the Defendant would have had pretrial knowledge of Mr. Quintero as a possible witness regarding his alleged transportation to Memphis.

Judge Blackwood concluded, "The fact that the [Appellant] wants to change his theory and now rely upon a defense of alibi and present evidence which was available to him at the time of the original trial does not warrant granting a new trial on the basis of 'newly discovered evidence.'"

In the Appellant's prior post-conviction appeal, this Court made the following comments regarding the Appellant's claim that his trial counsel were ineffective for not presenting an alibi defense:

> The post-conviction court found that [the Appellant's] alibi was manufactured after trial. The court thus concluded that counsel was not deficient in failing to present evidence in support of the alleged alibi. We likewise find [the Appellant's] post-conviction testimony lacking, and we, therefore, conclude that [the Appellant] has failed to prove, by clear and convincing evidence, the allegations of fact in support of his claim in this

respect. [The Appellant] acknowledged he knew before trial that the murders took place sometime between June 18 and June 22, 1988, a portion of which time he was supposedly not in the Leatherwood community. [The Appellant] claims he was in Memphis the night the murders took place, June 20, 1988. Yet he did not tell his attorneys about this fact, despite being told by his attorneys that the murders were committed when he supposedly was not there. Roberts testified she was aware of the State's theory on the time of death because she attended Blanton's trial.

[The Appellant] stated he did not pay much attention to the trial testimony. The trial court found this statement "farfetched" given the fact that [the Appellant] was on trial for a capital crime. The evidence demonstrates that [the Appellant] had some idea prior to trial when the murders occurred. He now expects this Court to believe that he sat through an entire six week trial, knowing he was not on the scene at the time of the crime, without voicing any concern to his attorneys. We, however, do not place much weight on his post-conviction testimony. [Trial counsel] testified that [the Appellant] took his cues from Quintero. She received the impression that the two defendants "were not going to have any different story about the events that went on. They had a common goal." [Counsel] testified that if either defendant had an alibi and the other did not, neither defendant was going to cross the other. Indeed, [the Appellant] specifically told counsel that he did not want his case severed from Quintero's. [Counsel] testified that [the Appellant] instructed her not to implicate either Quintero or Blanton because "they were in it together and their stories were going to stay the same."

Interestingly, although [the Appellant] testified at the hearing about his alleged alibi, he failed to mention anything about the alibi in his original pro se post-conviction petition. This despite his testimony that he read the supreme court's opinion which pinpointed the time of death. [The Appellant] testified he relied upon Quintero to help him draft his petition. This is consistent with [counsel's] testimony that [the Appellant] followed Quintero's lead during trial.

We have already discussed the proposed testimony by Celerino Quintero during our review of Quintero's issues. We conclude that Quintero's trial attorneys were not ineffective for failing to call Mr. Quintero as an alibi witness. We note that, in view of the fact that Mr. Quintero was the main alibi witness, it strains credulity to believe that this alibi witness was not mentioned. [The Appellant] apparently followed Quintero's lead throughout trial, and even

during the filing of the original post-conviction petitions. Our conclusion with respect to Quintero's claim that his attorneys were ineffective for calling his father as an alibi witness applies equally to [the Appellant's] argument. We do not find counsel's conduct to be unreasonable in this respect.

[Counsel] testified that she received from [the Appellant] only those facts which he wanted to impart. Counsel told [the Appellant] the time frame of the murders, and counsel cannot be held accountable if [the Appellant] decided not tell them he was not present during a period of that time-frame. Though counsel did not file a bill of particulars, we do not find counsel's conduct unreasonable. Counsel acknowledged they had open access to all of the State's files. [Counsel] stated she was not surprised by the testimony of the fishermen who heard the gunshots the night of June 20, 1988. [Counsel] testified their defense strategy was to highlight the State's circumstantial evidence. Indeed, both Quintero and [the Appellant] maintained the same defense.

*Quintero*, 2008 WL 2649637 at 50-51.

The foundation of the Appellant's entire newly discovered evidence claim simply cannot stand on its own. He would have the courts believe that he did not reveal evidence supporting his alibi because he did not pay attention during the trial in which his life was literally on the line. Like Judge Blackwood, we choose not to believe the Appellant's explanation. His self-serving attempt now to manufacture a different defense about which he should well have already known does not gain him any favor. The Appellant's testimony is simply not credible. Similarly, the testimony of Cauthern and King is equally unbelievable, and it would otherwise be inadmissible hearsay, as the trial court correctly noted. *See* Tenn. R. Evid. 801(c). The record of the telephone call is unpersuasive. The Appellant has failed to satisfy all of the elements outlined in *Nichols*. 877 S.W.2d at 737.

Accordingly, after review, we conclude that Judge Blackwood did not abuse his discretion by rejecting the Appellant's alleged newly discovered evidence. The Appellant is not entitled to relief on this issue.

III.     Sufficiency of the Evidence

As discussed above, the supreme court affirmed this Court's conclusion on direct appeal that the evidence was sufficient to support the convictions. *Hall*, 976 S.W.2d at 140-41. The Appellant again now challenges the sufficiency of that convicting evidence. "Under the doctrine of the law of the case, when an initial appeal results in a remand to the trial

26

court, the decision of the appellate court establishes the law of the case, which must be followed upon remand." *State v. Carter,* 114 S.W.3d 895, 902 (Tenn. 2003). An issue decided in a prior appeal may only be reconsidered when

> (1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

*Id*.

As this Court recognized on direct appeal, a crime may be established by direct evidence, circumstantial evidence, or a combination of the two. *Hall*, 976 S.W.2d at 140 (citing *State v. Tharpe,* 726 S.W.2d 896, 899-900 (Tenn. 1987)). Our supreme court has since held that circumstantial evidence is as probative as direct evidence. *State v. Dorantes,* 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances 'so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt.'" *Id.* at 380 (quoting *State v. Crawford,* 470 S.W.2d 610, 612 (Tenn. 1971)). Therefore, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *Id.* at 381. To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." *State v. Sisk,* 343 S.W.3d 60, 67 (Tenn. 2011). Accordingly, the standard of review when the sufficiency of the evidence is challenged remains the same: the relevant question is whether, after a consideration of the evidence in the light most favorable to the state, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307 (1979); *State v. Williams,* 657 S.W.2d 405 (Tenn. 1983), *cert. denied,* 465 U.S. 1073 (1984); Tenn. R. App. P. 13(e).

The Appellant asserts that the post-conviction evidence Judge Blackwood agreed to review before ruling on the motion for new trial, mainly the alleged newly discovered evidence, was substantially different than the trial evidence and thus warrants another review of the sufficiency of the convicting evidence in this delayed appeal. We disagree. Judge Blackwood merely agreed to consider that evidence before deciding if it qualified as newly discovered evidence warranting a new trial. Because he concluded that the evidence did not qualify as newly discovered, which we herein affirm, it does not alter the prior holding on the sufficiency issue. And contrary to the Appellant's insistence, the prior ruling was not clearly erroneous and will not result in a manifest injustice if allowed to stand. The

27

Appellant cannot gain another bite at the proverbial apple simply by changing his theory of defense after the fact. None of the exceptions enumerated in *Carter* apply in this case. Accordingly, the Court's previous ruling that the evidence was sufficient to support the convictions is the law of the case.

IV.     Use of Physical Restraints During Trial

The Appellant contends he was improperly shackled during trial in the presence of the jury in violation of his due process rights. The Appellant relies upon the evidence introduced at the post-conviction hearing which consisted of the testimony of one juror and the deputy sheriff responsible for transporting the defendants to and from the jail. The juror testified that he remembered seeing the defendants brought into the courtroom in shackles as the jury was in the box "setting up." However, the evidence does not demonstrate during which stage of the trial that occurred. The deputy sheriff testified that he brought the defendants into the courtroom in shackles, however, he testified he always removed the restraints before the jury entered. He testified that the defendants never appeared in handcuffs or shackles in the presence of the jury. The post-conviction court found as a matter of fact that the defendants were in leg shackles during the penalty phase of the trial but not the guilt phase. Prior to the commencement of the sentencing stage, counsel for the defendants requested that the shackles be removed. Based upon the deputy's observations that the shackles were hidden from the jury's view, the trial judge refused.

In *Deck v. Missouri*, the Supreme Court established a new rule of constitutional law: routine shackling of a defendant during the penalty phase of a capital trial, absent the showing of a case specific security need, violates the defendant's due process rights unless the state demonstrates beyond a reasonable doubt that the shackling did not contribute to the sentence imposed. 544 U.S. 622 (2005). Despite the pronouncement of this new rule, the United States Supreme Court stated that the general prohibition against physical restraints during the guilt phase of a trial is deeply rooted in the common law. *See, e.g., Willocks v. State*, 546 S.W.2d 819 (Tenn. Crim. App. 1976).

On appeal, the Appellant argues that he is entitled to a new trial because one juror apparently saw him and Quintero in shackles during the course of the trial. The Appellant does not identify during which stage of the trial the juror saw the defendants, however. Nevertheless, the record does not support any reference to the guilt phase. As this Court noted in the post-conviction appeal, though, the record does reflect that the Appellant was shackled during sentencing. Judge Blackwood denied relief on this claim:

> In the transcript, just before the beginning of the penalty phase, Defendant Hall's attorneys object[ed] to the fact that their client [had] been

placed in leg shackles. The Court responded that the Sheriff was in charge of security and felt that this was a necessary procedure which the Court would allow. The attorneys again objected later by stating that they thought the shackles were visible to the jury but the Court stated that the Sheriff and others had also looked and did not think that the shackles were visible. One juror, Mr. Henry Clay Skeleton, whose prior post-conviction testimony was admitted for consideration[,] previously testified that he had seen the Defendant in shackles in the courtroom. He stated that the Defendant had been brought into the courtroom in shackles. In part of his testimony, he stated that "If I remember correctly, I think he was in shackles." Two other jurors previously testified in the post-conviction proceedings that they had been unaware of the Defendant being in shackles. [Footnote omitted]. A deputy who transported the Defendant every day of the trial also previously testified that he had the Defendant sitting at the table every day before the jury was brought into the courtroom.

The facts of this case included an escape from a state prison by multiple persons, breaking into various residences to obtain food, shelter, money, and weapons, and the ultimate death of two elderly victims by the use of multiple weapons which were obtained during the escape and flight from incarceration. Here, two of the individuals who escaped were being tried in the same rural courthouse at the same time and both were found guilty and were facing much longer sentences than those for which they had previously escaped. One of the two had two prior escapes on his record. Pretrial, the Sheriff had filed an affidavit addressing security concerns in the housing of the defendants in this case and as a result the trial court had ordered that they be housed at the State Penitentiary. The Sheriff also had concerns for security in the courthouse. The Sheriff's concerns for security were appropriate in the trial court's view at the time and this Court agrees. In addition, this Court finds that the jury verdict was not influenced by this security measure. The jury only returned one of two possible death verdicts and the evidence more than sufficiently supported the verdict of death in this case.

While his motion for new trial raised this issue as to the sentencing phase of the proceedings, in his post-hearing brief, the Defendant asserts that shackling occurred during the guilt phase of the proceedings and that Juror Skeleton's testimony supported this. This Court, however, cannot agree with this assertion. Juror Skeleton's testimony was not absolute and the officer testified that the Defendant was seated in the courtroom prior to the jurors arrival each day. In addition, the trial court entered an order on March 5, 1991,

29

regarding the prohibition of shackling at trial in front of the jury and only readdressed the issue on the record after the verdicts were in as to guilt but prior to the sentencing of the Defendant by the jury. The record simply does not support this claim and the Defendant is not entitled to a new trial on this issue.

We agree with Judge Blackwood that the record fully supports the showing of a specific security need and that the shackling did not influence the sentences imposed. Accordingly, this Court concludes that Judge Blackwood did not err in denying relief on this issue.

V.      Ineffective Assistance of Counsel

The Appellant argues trial counsel were ineffective for failing to locate the telephone call log which showed a call was made from a pay phone in the Memphis Greyhound Station to Texas on the date the victims were murdered. The supreme court held the Appellant's post-conviction appeal in abeyance pending final disposition of this delayed appeal. As that court recognized, if the Appellant is unsuccessful in his delayed appeal, any new grounds for post-conviction relief resulting from the handling of the delayed appeal may be asserted by amending the original post-conviction petition. *See* Tenn. Sup. Ct. R. 28, Sec. 9(D)(3). The instant ground for relief, however, is directed at trial counsel. As such, this ground for relief should have been included in his original petition. The instant delayed appeal does not provide the Appellant a means for raising additional post-conviction claims which should have been presented earlier. Rule 28 specifically limits the nature of claims which may be added to the post-conviction petition to those that arose from the handling of the delayed appeal. Because the instant post-conviction claim did not arise from the handling of the delayed appeal, and because the Appellant did not present this claim earlier, it must be considered waived.

> A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:
>
> > (1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or
> >
> > (2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

30

Tenn. Code Ann. § 40-30-106(g).

Neither of the two exceptions apply here. Accordingly, the Appellant is not entitled to relief on this claim.

*Conclusion*

Although the Appellant does not challenge the propriety of his death sentence, the supreme court conducted its statutorily mandated review on direct appeal. As with the sufficiency of the convicting evidence, the supreme court's affirmation of the sentence of death is binding as law of the case. *See Carter,* 114 S.W.3d at 902.

For the reasons stated herein, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE